# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO: 3:18-cr-64 |
| | ) | |
| vs. | ) | **REPORT AND RECOMMNEDATION** |
| | ) | **ON DEFENDANT'S MOTION TO** |
| CLARENCE WASHINGTON, | ) | **SUPPRESS** |
| | ) | |
| Defendant. | ) | |

**TABLE OF CONTENTS**

I.    INTRODUCTION……………………………………………………………....…..2

II.   FINDINGS OF FACT……………………………………………………….….……3

      A. GPS TRACKING WARRANT …………………………………………………4

      B. TESTIMONY OF OFFICER MARK DINNEWITH…...………………….…..…5

      C. TESTIMONY OF OFFICER ROBERT WELCH………….…………………….8

III.  ANALYSIS OF MOTION TO SUPPRESS...………………………………………...11

      A. THE GPS LOCATION DATA………………………………………………...12

      B. THE VEHICLE STOPS……………………………………….………………..18

          1. NOVEMBER 20, 2020………………………………………………………18

          2. FEBRUARY 18, 2021……………………………………………….……...19

IV.   RECOMMENDATION AND ORDER…………………………………….........22

## I.     INTRODUCTION

This matter comes before the Court pursuant to Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing (Dkt. 97) and Brief in Support (Dkt. 97-1), both filed May 21, 2021 by Clarence Washington ("Defendant"). Defendant seeks to prohibit using evidence from a GPS tracking device placed on a vehicle associated with Defendant. Dkt. 97. In addition, Defendant seeks to prohibit the government from using as evidence the physical items found and seized during two searches of vehicles on November 2, 2020 and February 18, 2021, the testimony of the officers concerning their observation of the physical items allegedly found during the search and detention, and any testimony concerning alleged statements or admissions by Defendant. *Id*. The government resisted the motion on August 2, 2021. Dkt. 116. Defendant filed his reply on August 13, 2021. Dkt. 119. The matter was referred to this Magistrate Judge for report and recommendation by Chief Judge John A. Jarvey. Dkt. 98.  Trial is set for September 27, 2021. Dkt. 104.

An evidentiary hearing was held on August 20, 2021. Dkt. 120. The government appeared by Assistant U.S. Attorney Andrea Leigh Glasgow. Defendant appeared personally and with his attorney, Terence L. McAtee. Testimony was received from Officer Mark Dinneweth of the Davenport, Iowa Police Department and Officer Robert Welch of the Davenport, Iowa Police Department. The Court received three exhibits offered by the government without objection: Exhibit 1 – the GPS search warrant for this case, Exhibit 2 – an email sent by Officer Dinneweth on February 18, 2021, and Exhibit 3 – a map showing the overhead view of the location of the February 18, 2021 traffic stop. The Court received two exhibits offered by Defendant over relevance objections by the government: Exhibit A – a photograph of Defendant on February 20,

2021 and Exhibit B – a photograph of Defendant on February 18, 2021. No further briefings were submitted by the parties.

The Court considers the matter to be fully submitted. This Magistrate Judge has carefully considered the record evidence, including the exhibits admitted, the briefs filed by both parties, the arguments and statements of counsel and submits the following report. As set forth below, based on the facts presented and applicable law, it is recommended the motion be granted in part and denied in part.

## II.  FINDINGS OF FACT

A three-count criminal indictment was filed on June 20, 2018 against Defendant alleging Count 1 - possession of cocaine base with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), Count 2 - possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A), and Count 3 - felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Dkt. 2.

On July 5, 2018, after a detention hearing, Defendant was ordered released pending trial. Dkt. 20. Defendant filed a motion to suppress evidence and statements regarding Counts One and Two of the indictment. Dkts. 35, 36. Such motions were denied.  Dkt. 42. Trial was set for February 25, 2019. Dkt. 51. On February 13, 2021 a change of plea hearing was scheduled for February 14, 2021. Dkt. 62. Prior to the hearing, the United States Probation Office filed an emergency motion for a warrant for Defendant's arrest, as it was reported Defendant had cut off his GPS ankle bracelet. Dkt. 63. Pursuant to such request, a warrant was issued for his arrest. Dkt. 64.

On November 2, 2020, Defendant was arrested by the Scott County Sheriff after a traffic stop. Dkt. 68. Despite the outstanding federal warrant, Defendant was released from custody. Dkt. 69. On February 18, 2021, the Davenport Police Department arrested Defendant after a traffic stop.

*Id*. Defendant subsequently appeared before this Magistrate Judge on February 24, 2021, and these proceedings resumed. Dkt. 71.

A superseding indictment was filed March 10, 2021 against Defendant alleging the following counts: Count 1 - possession of cocaine base with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), Count 2 - possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A), Count 3 - failure to appear in violation of 18 U.S.C. § 3146(a)(1), Count 4 - conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846, Count 5 - possession with intent to distribute a controlled substance in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(C), Count 6 - use and carry of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), and Count 7 - drug user in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). Dkt. 84.

### A.     GPS Tracking Warrant

A search warrant authorizing the installation of a GPS tracking device was issued on August 14, 2020 by a judicial officer in Scott County, Iowa concerning a black Infiniti G35X vehicle ("Target Vehicle") associated with Defendant. Gov't Ex. 1. Detective C. Carter of the Scott County Sheriff's Office requested the authorization for a GPS tracking device to be concealed on the Target Vehicle to conduct surveillance. *Id*. at ¶ 3. In support of the request, the search warrant included information from two confidential sources, both of whom were found to be reliable and credible, indicating Defendant was involved in drug dealing from March of 2020 through August of 2020. *Id*. at ¶¶ 7-15 and pp.7-8. The search warrant also contains information about a controlled purchase of illegal controlled substances conducted by a confidential source with Defendant in the Target Vehicle within ten days of the request for the search warrant. *Id*. at ¶¶ 13, 14.

### B.     Testimony of Officer Mark Dinnewith

Officer Mark Dinnewith has been a police officer with the Davenport Police Department for twenty-one years. He has been and currently is a patrol officer. He has also been a member of the Criminal Investigation Division. On February 18, 2021, he was working patrol in the five beat or middle of the city. At approximately 9:56 a.m., he was dispatched to a call for service and met with Stevie Graves.

Ms. Graves told him about events from that morning involving Defendant. She was having breakfast at Anchor Grill in Davenport, Iowa and Defendant approached her at the restaurant. After a brief conversation, she left the restaurant and noticed Defendant following her. Next, she received threatening texts from Defendant, and she proceeded to her home. Defendant continued to follow her. Ms. Graves told Officer Dinnewith Defendant yelled something like "I should have killed you or I should have did something before or I want to hurt you so bad" while lifting his shirt to display a gun. She confirmed she had a previous relationship with Defendant and knew the gun she saw was one Defendant carried on a regular basis. Outside of her home, she tried to get away from Defendant, but there was ice on the ground, and Defendant was able to catch her prior to her reaching the door to her home. Ms. Graves said Defendant punched her, knocked her down, and took her keys to her home and car.

Officer Dinnewith testified there was snow on the ground, but he did not notice any footprints or areas where the snow had been disturbed to corroborate what Ms. Graves told him. He noted the snow and ice were hard packed, eight to twelve inches deep. He testified he was not concerned about not seeing evidence of a struggle from the snow. He had no further information as to whether her keys were ever recovered.

Officer Dinnewith was candid during the hearing regarding his knowledge of Ms. Graves. He has known her for approximately twenty years through his work as a police officer. He dealt with Ms. Graves when she was a juvenile, when she has been a victim, when she has been accused of crimes, and when she had trouble with her own children. Although he has known Ms. Graves for many years, he admitted he was not aware of a specific felony conviction for her. However, when Ms. Graves indicated she could not protect herself because she is a felon, this information made sense to him.

During the hearing, he was frank, admitting Ms. Graves is not always reliable, but he believed she was on February 18, 2021. He mentioned multiple times his observations as to her level of fear, stating he had never seen Ms. Graves as scared as she was on February 18, 2021. [1] He discussed his history with Ms. Graves and his observations of her when he interviewed her. His described an injury to her face, specifically a red, swollen bruise consistent with what she described, in addition to a general disheveled appearance.  In his report, he included information about the injury but not about Ms. Graves being scared or disheveled.

Ms. Graves told Officer Dinnewith she knew Defendant was "wanted" and had been hiding for some time. She noted he had changed his appearance by shaving his head. Ms. Graves also told him multiple times Defendant said he was going to shoot it out with police. Ms. Graves described the vehicle Defendant left in that morning – a 2009 white Acura. She informed him this vehicle was registered to an Edward Flowers. From the information he gleaned from Ms. Graves, Officer Dinnewith understood Defendant used this vehicle as his own even though the vehicle was registered to another person. He testified, in his work as a police officer, it is not uncommon for

---

[1] Officer Dinnewith admitted he told a federal pretrial services officer the robbery was not as bad as it sounds. He also testified he told a pretrial services officer Ms. Graves was "an old school shit head."

someone to use a vehicle registered to another person. Officer Dinnewith was not sure if he received a full physical description of Defendant from Ms. Graves.

Officer Dinnewith wasted no time and contacted the Scott County Attorney's Office. After explaining the situation to one of the Scott County state attorneys, he was able to obtain a "twenty-four-hour arrest warrant" for a robbery charge. This is a procedure established by the Scott County Attorney's Office. The procedure does not involve issuing a formal arrest warrant but provides authorization to make an arrest.

His next step was to alert other Davenport Police Department officers by email of the information he had regarding Defendant including the robbery charge, information about the Acura including the license plate number he received from dispatch and the registration to Edward Flowers, potential whereabouts of Defendant, and his concern for officer safety. Gov't Ex. 2. The email contained Defendant's name and date of birth so the officers could use the Davenport Police Department computer system to review physical description information as well as other information about Defendant. The information he gave was intentional as he was concerned Defendant may change vehicles, and he wanted to get the information out as soon as possible.

Although Officer Dinnewith tried to locate Defendant that day, he was unsuccessful and, after writing his report, his involvement with the case ended. He did not check Ms. Graves' phone for threatening text messages. Ms. Graves asked her neighbors not be involved, so he did not contact them. He did not try to obtain surveillance camera footage in the area or at Anchor Grill. Due to his prior work with the Criminal Investigation Division, he understood another officer would conduct a follow-up investigation.

C.      **Testimony of Officer Robert Welch**

Officer Robert Welch of the Davenport Police Department has been a police officer for approximately seventeen years. He was hired in August of 2000, had a four-year break from 2008-2012 to be a federal agent, and then returned to the Davenport Police Department in September 2012. He is currently a patrol officer, returning to that role in November of 2020, has been a full-time field training officer and has been assigned to the NETS unit, which is a targeted neighborhood unit. As a field training officer, he worked for five years developing lessons and curriculum for officers in fire training, tactics, service training, and use of force training.

On February 18, 2021, he was working as a patrol officer on the day shift, which encompasses 6:45 a.m. to 3:15 p.m. He continued working into the first half of the afternoon shift due to short staffing. He was assigned to a west side utility car which is an additional officer who floats between beats or geographic locations within the city. Prior to lunch, he heard a radio dispatch sending Officer Dinnewith to a disturbance on the east side of town. Later, on another radio channel, he heard a conversation between Officer Dinnewith and Davenport Police Department Street Supervisor Sergeant Jason Willie. Officer Welch explained there are different radio channels used by the Davenport Police Department. Channel One is the primary channel, used for general radio traffic. Channel Two is used for more in depth conversations.

Officer Welch listened to the conversation about the general facts of the call, a possible robbery charge for Defendant, and consulting with the on-call county attorney. He received the email sent by Officer Dinnewith regarding his discussion with the county attorney, the approval of a robbery charge for Defendant, and the description of Defendant's vehicle. The description of the vehicle stood out to Officer Welch because of its specificity, especially the license plate number KBV 762 as "762" is a common firearm rifle round. When his day shift was over, he returned to

the police station to speak with the afternoon shift supervisor. They discussed Officer Dinnewith's email and that it would be a pursuable vehicle according to their department pursuit policy. The Davenport Police Department pursuit policy is strict and does not allow for officer discretion to chase a vehicle. Generally, vehicle pursuit is only allowed for crimes of violence, specifically forcible felonies.

While on the afternoon shift, he was dispatched to an unrelated call. After clearing this call at approximately 5:45 p.m., he observed a white sedan travelling east on 40th Street toward Division Street in Davenport, Iowa. The sun was going down, but it was still light outside. The vehicle caught his eye because it was very clean and had the KBV 762 license plate number. Officer Welch was not able to see through the side windows of the vehicle but could see through the windshield. He could not remember if the windows were tinted.

He saw the vehicle turn into the northwest entrance of the Walgreen's pharmacy store on Kimberly Road and Division Street and go to the center of the parking lot, pulling into a parking spot facing south. Officer Welch stopped in front of the Walgreen's building and radioed about finding the white sedan. He wanted additional officers to help him to approach the vehicle due to the report of a crime of violence, the time of day being rush hour, and officer safety concerns. His goal was to attempt to contain the vehicle to prevent a vehicle pursuit in case the driver tried to flee.

While waiting for the other officers, Officer Welch observed the vehicle and thought about ways to contain and approach it. He remembered seeing the brake lights being on for a significant amount of time, indicating the vehicle was not in park. He saw a female subject exit the passenger side of the vehicle and walk towards the main entrance of Walgreen's. He had not seen this person

in the vehicle before she exited. He radioed this information. As he did not see anyone exit the driver's side, he believed someone was still in the vehicle.

Within a few minutes, other officers arrived. Officer Welch communicated to the other officers he would like them to block the vehicle. Initially he wanted the Kimberly Road exit blocked first, but then decided it would be better to block the 40th Street entrance first because it was not in the sightline of the driver. Corporal Danny Antle of the Davenport Police Department radioed he was blocking the 40th Street entrance.

As Officer Nathan Messmer of the Davenport Police Department pulled in to block the Kimberly Road exit, the white sedan accelerated quickly turning left towards Division Street. Officer Welch believed the driver was attempting to flee. He accelerated to meet the vehicle at the east exit, and it was at this point he saw the driver was a black male. Officer Welch testified he did not know if it was Defendant because he did not know Defendant by sight. He also did not know the registered owner Edward Flowers. He had reviewed information about Defendant including his race and local involvements prior to seeing the driver of the white sedan.

The vehicle made a hard left turning back toward the west. While this was occurring, other officers were still attempting to get into position to initiate a stop. No one had activated lights or sirens. Officer Welch attempted to radio the location of the vehicle. He saw Corporal Antle running on foot towards him and saw Officer Messmer's squad car next to the white sedan. It appeared the vehicle was up on a snowbank and had been forcibly stopped.

Officer Welch attempted to position his squad car in such a way as to put Officer Messmer's squad car in between the white sedan and his squad car. Officer Messmer got out of his squad car and proceeded towards the front of the vehicle. Officer Welch then heard multiple gun shots coming from the far side of Officer Messmer's squad car and heard Officer Messmer

say something like "he's reaching" and "he's got a gun." Officer Welch exited his squad car, stayed low, did not fire his duty weapon, and maneuvered to where Officer Messmer was to assist him. From the time he saw the driver of the vehicle at the Division Street entrance until he maneuvered his squad car back around by Officer Messmer, Officer Welch estimated ten seconds to fifteen seconds had elapsed.

The scene was then contained. As Officer Welch helped take Defendant into custody, he observed a pistol laying in the center console area of the vehicle. This was the first time he saw a firearm related to this incident.

Regarding Defendant's physical appearance, Officer Welch could not remember if Defendant had a face covering or if he had hair on his head. At the hearing, Officer Welch testified he was not able to identify the person in Defendant's Exhibit A as Defendant. He did say he could identify Defendant if he saw him elsewhere.

Officer Welch testified he was directed not to write a report as this was an officer-involved shooting and his statement would be covered by an interview. He did not review the report by Officer Dinnewith. After the stop, he had no further involvement with this case.

### III.    ANALYSIS OF MOTION TO SUPPRESS

Defendant contends the stops of the vehicles on November 2, 2020, and February 18, 2021, violated Defendant's fourth amendment rights; all evidence obtained from the GPS tracking device should be suppressed; and the search warrant is not supported by probable cause. Dkt. 97-1 pp. 2-8 and Dkt. 119 pp. 2-8. He seeks to suppress the physical items found and seized during the search after each of the traffic stops, the testimony of the officers concerning their observation of the physical items allegedly found during the search and detention, any testimony concerning alleged statements or admissions by Defendant following the search, and statements by Defendant made

during the interrogation. Dkts. 97, 97-1, and 119. There was no evidence presented by way of briefing or at the hearing regarding a statement or admissions by Defendant following a search or during an interrogation.

The government resists the motion regarding suppression of the evidence from the stop on February 18, 2021 and the evidence from the GPS tracking device. Dkt. 116. Each argument will be addressed in turn.

### A.    The GPS Location Data

Defendant maintains the information in support of the search warrant application fails to make the necessary showing of probable cause. Dkt. 119 p. 6. Given the lack of probable cause as described in his brief, he contends no officer executing this warrant could have objectively and reasonably believed probable cause existed to place the GPS tracking device on the vehicle. *Id.* p. 8. As such, the evidence obtained from the GPS tracking device is not admissible under *Leon's* good faith exception. *Id.* He also argues the information contained in the search warrant itself establishes his standing to challenge the search warrant. *Id.* p. 6.  The government counters even if the Court finds Defendant did have a reasonable expectation of privacy in the vehicle, there was a valid search warrant for the vehicle, which Defendant has not challenged. Dkt. 116 p. 6.

Regarding standing, we adhere to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. *Alderman v. United States*, 394 U.S. 165, 174 (1969); *Simmons v. United States*, 390 U.S. 377, 389 (1968); *Jones v. United States*, 362 U.S. 257, 261 (1960); *cf. Tileston v. Ullman*, 318 U.S. 44, 46 (1943). Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of

a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally. *Id.*

This Magistrate Judge is satisfied Defendant has standing to challenge the search warrant due to the information contained within the search warrant itself regarding Defendant's connection to the target vehicle. Although the search warrant does not explicitly indicate Defendant owned or controlled access to the Target Vehicle, it clearly describes Defendant's possession and control of the Target Vehicle, as well as probable historical use. Gov't Ex. 1 ¶¶ 13, 14, 17, 18. Indeed, the search warrant is directed at discovering Defendant's movements from those of the Target Vehicle, not those of an unknown person. It has been recognized the expectation of privacy in the details of one's physical movements in public is a reasonable expectation of privacy. *Carpenter v. United States,* 138 S.Ct. 2206, 2217 (2018).

Turning to the question of probable cause, "[a] supporting affidavit establishes probable cause to issue a search warrant if it 'sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched.'" *United States v. Mazzulla*, 932 F.3d 1091, 1098 (8th Cir. 2019) (quoting *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Snyder*, 511 F.3d 813, 817 (8th Cir. 2008))). Whether probable cause supports the issuance of the warrant is based upon a "common-sense reading of the entire affidavit." *United States v. Seidel*, 677 F.3d 334, 338 (8th Cir. 2012) (quoting *United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir. 1982) (quotation and citation omitted)).

The "[i]ssuance of a search warrant must be supported by probable cause," which exists when, "under the totality of the circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place." *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019) (citing *U.S. v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (*see United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995))). When reviewing the issuance of a warrant, we afford great deference to the issuing judge's probable-cause determination, ensuring only that the judge "had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Petruk*, 929 F.3d at 959 (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

When the judge relies solely on the affidavit presented, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (citing *United States v. Leichtling,* 684 F.2d 553, 555 (8th Cir. 1982), *cert. denied,* 459 U.S. 1201 (1983)). Not only may an issuing judge "draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, we have also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant." *Brackett*, 846 F.3d at 992 (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000) (citations omitted)).

"Placement of a GPS tracking device on a vehicle is a 'search' within the meaning of the Fourth Amendment, requiring probable cause and a warrant." *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *Faulkner*, 826 F.3d at 1144). The point of putting a tracker on a car is not to reveal what the car contains but to reveal the locations and movements of those within it. *Id.* at 911.

Here, the search warrant affiant, Deputy C. Carter, has been with the Scott County Iowa Sheriff's Department for ten years. He stated, from his training and experience, he knows people who possess and sell controlled substances utilize vehicles to transport those substances from their initial acquisition point to the location where the drugs are stored, to the location of distribution and also to meet with associates. Gov't Ex. 1 ¶ 2. The search warrant details information from two confidential sources evidencing continuing drug distribution activity by Defendant from March 2020 to August 2020. *Id*. at ¶¶ 7-15. One source informs law enforcement Defendant bragged about having the best crack cocaine in town, having just returned from Chicago with a supply. *Id*. ¶ 8. Both sources are found to be credible by the issuing judge, in part, due to their statements corroborating each other and due to law enforcement surveillance corroborating their statements. *Id.*

Focusing on the Target Vehicle, paragraphs thirteen and fourteen detail a drug transaction between Defendant and a confidential source conducted *inside* the Target Vehicle within the ten days prior to the date of the search warrant. *Id*. at ¶¶ 13, 14. The search warrant sets forth the details of the controlled transaction, including searching the source before and after the transaction, attaching a recording device to the source, providing the source with pre-recorded currency, and surveilling the scene. *Id.* Law enforcement witnessed Defendant as the driver of the Target Vehicle, picking up the source at the outset of their meeting and dropping the source off at the end of the transaction. *Id.*

This confidential source was found to be of truthful reputation, with no motivation to falsify information and demonstrated truthfulness as follows:

> CS2 has provided information within the past 14 days that has led to felony charges, large amounts of heroin and stolen firearms. Your Affiant and fellow Agents have corroborated a large majority of CS2's information by way of surveillance, records management systems as well as having CS2 conduct controlled purchases for

narcotics. CS2 at no time has provided information in which your Affiant has been able to identify as false or misleading.

Gov't Ex. 1 – Informant's Attachment Confidential Source 2 (CS2).

Given the above information Defendant is travelling out of town to acquire controlled substances, the connection between Defendant and the Target Vehicle, evidence from reliable sources with corroborating information Defendant has been trafficking controlled substances for a period of time and an actual controlled purchase of controlled substances using the Target Vehicle itself, all provides ample reason to allow a judicial officer to make a practical, commonsense decision that evidence of Defendant trafficking drugs would be found based upon the location data of the Target Vehicle.  The totality of the circumstances set forth in the information in the search warrant provides more than sufficient probable cause supporting the issuance of the warrant.

To provide a complete analysis, this Magistrate Judge next considers, if there was insufficient probable cause to support the search warrant, whether the *Leon* good faith exception to the exclusionary rule would apply in this case.

The United States Supreme Court has created a good faith exception to the exclusionary rule. *United States v. Leon*, 468 U.S. 897 (1984). "Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Ortiz-Cervantes*, 868 F.3d 695, 702 (8th Cir. 2017) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)).

*Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in

issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable "; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Leon*, 468 U.S. at 923.

"In assessing whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the affidavit...." *United States v. Johnson*, 848 F.3d 872, 879 (8th Cir. 2017) (quoting *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007)). The test for whether the good faith exception applies is "whether a reasonably well trained officer would have known that a search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922, n. 23.

Defendant conceded at the hearing the *Leon* exception to the exclusionary rule is not the highest of bars. In this case, the bar is easily surpassed. No evidence was presented the affidavit in support of the search warrant contained any false information, nor was evidence presented the issuing judge abandoned her neutral and detached role. In addition, an officer's reliance on the warrant was objectively reasonable in this case. The search warrant does not lack for indicia of probable cause, nor is it facially deficient. The information in the search warrant is recent and established the confidential sources' credibility. It is entirely reasonable for an officer to infer Defendant would use the Target Vehicle for transportation of and accessibility to illegal controlled substances. *See* Gov't Ex. 1 at ¶¶ 2, 13, 14. The search warrant in this case contains more information than simply indicating the Target Vehicle was available to Defendant. It contains more information than simply an officer's belief evidence will be located within the Target Vehicle. The search warrant details a drug deal occurring within ten days of the issuing date involving Defendant, the Target Vehicle and a reliable confidential source.

In *United States v. Lopez-Zuniga,* the Eighth Circuit applied the *Leon* good-faith exception to a warrant that allowed GPS tracking of a car for sixty days despite the lack of a demonstrated nexus between the car and the suspected crime of drug trafficking. 909 F.3d 906, 910–11 (8th Cir. 2018), *cert. denied*, –––– U.S. ––––, 139 S. Ct. 2648, 204 L.Ed.2d 292 (2019). The Court noted, "we do not think it entirely unreasonable for an officer to think that [the defendant] might use his car to move about in furtherance of a drug conspiracy." *Id*. at 911. Further, it did not "think it entirely unreasonable for an officer to conclude that a connection between the car and the contraband need not be as strong when the warrant merely authorizes tracking the car's movement (and thus its driver) rather than searching the car itself." *Id.* The present case involves much more of a connection between the car and suspected drug trafficking than that in *Lopez-Zuniga.* Here the warrant itself describes an actual drug transaction occurring in the vehicle itself.

Accordingly, this Magistrate Judge finds the search warrant contains sufficient, untainted information within the four corners of the document to support the probable cause finding of the issuing judge. Regardless, the *Leon* good faith exception would apply to the search warrant in this case.

### B.      The Vehicle Stops

#### 1.   November 20, 2020

Defendant argues there was no basis for the November 20, 2020 vehicle stop. Dkt. 97-1 p. 5. The government states in its briefing, and confirmed on the record at the hearing, it will not use evidence of the November 20, 2020 vehicle stop in its case in chief. Dkt. 116 p. 4. On this basis, this Magistrate Judge recommends granting Defendant's motion, suppressing evidence from the November 20, 2020 vehicle stop, providing the government may not use it in its case in chief.

### 2.  February 18, 2021

Defendant contends the officers did not have a basis for the February 18, 2021 vehicle stop. Dkts. 97-1 p. 5 and 119 pp. 3-4. In his view, the stop appeared to be a mere hunch Defendant may be operating the Flowers vehicle nearly eight hours after the interview of the complainant. Dkt. 119 p. 4. The government contends Defendant's analysis is flawed, as police may lawfully conduct a *Terry* stop of a vehicle, unrelated to the operation of the vehicle, if they have reasonable suspicion of involvement in criminal activity. Dkt. 116 p. 6.

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV.  Its requirement that searches and seizures "be founded upon an objective justification" applies to all seizures, even those "that involve only a brief detention short of traditional arrest."  *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (citation omitted).  A seizure occurs where law enforcement restrains the liberty of a citizen by either physical force or a show of authority.  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1983). "Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *United States v. Yousif*, 308 F.3d 820, 828 (8th Cir. 2002) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)).

The stop must be based on "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law." *Prouse*, 440 U.S. at 663. As such, a traffic stop must be justified by "reasonable suspicion ... that criminal activity may be afoot." *United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir. 2020); *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks and citation omitted). The reasonable suspicion inquiry asks "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."

*Sanchez*, 955 F.3d at 674; *United States v. Walker*, 771 F.3d 449, 450 (8th Cir. 2014) (quotation marks and citation omitted). An officer with reasonable suspicion may stop the automobile and may question the driver "to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Johnson v. Crooks*, 326 F.3d 995, 998 (8th Cir. 2003); *Berkemer v. McCarty,* 468 U.S. 420, 439 (1984).

In this case, it is clear there was a basis to seize Defendant. The email from Officer Dinnewith sets forth two separate bases to allow Officer Welch to seize Defendant – the active federal arrest warrant and the approved robbery charge. *See* Gov't Ex. 2. Defendant does not contest the validity of the federal arrest warrant. Further, the information provided to Officer Dinnewith is more than sufficient to establish reasonable suspicion of wrongdoing by Defendant. The email from his colleague itself also gives Officer Welch an objective basis that Defendant is subject to seizure for violation of the law.

Since Defendant could be seized, the question turns to whether the vehicle could be stopped. In this case, it is clear Officer Welch had reasonable suspicion to believe Defendant was in the vehicle. *See United States v. Pyles*, 904 F.3d 422, 424 (6th Cir. 2018) ("Once an officer discovers that a car's owner has an outstanding arrest warrant, he needs only reasonable suspicion that the owner is in the vehicle").

Officers knew multiple pieces of information connecting Defendant to this particular vehicle. An alleged robbery had occurred the same day, in the same city, approximately eight hours earlier in which Defendant drove away in a vehicle of the same make, model and license plate number. While Officer Dinnewith testified he has encountered people changing vehicles, this vehicle was known to be used by Defendant and had been that very day. Ms. Graves provided detailed information about Defendant and his recent activities.

That the vehicle was not registered to Defendant does not detract from the likelihood he would be driving it and present in it. Officer Dinnewith testified based on his experience, he knows people often register a vehicle for others who for one reason or another are unable to do so on their own. In this case, Ms. Graves provided detailed information corroborated by Officer Dinnewith's investigation. In particular, the vehicle was a 2009 white Acura, registered to an Edward Flowers. When he checked records to determine a license plate number, Officer Dinnewith found the information to be completely accurate. As such, the information the officers had to place Defendant in the white sedan was more than a hunch.

This Magistrate Judge finds there was reasonable suspicion to stop the vehicle and detain Defendant as officers had a particularized and objective basis for suspecting criminal activity on his part and a particularized and objective basis for suspecting Defendant was in the vehicle.

### IV. RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing (Dkt. 97) be granted in part and denied in part, as follows:

a. the Motion be granted as to use, in the government's case in chief, of the November 20, 2020 stop; but

b. the Motion be denied as to the balance of the evidence Defendant seeks to suppress.

IT IS ORDERED, the parties have until September 23, 2021 to file written objections to the Report and Recommendation, pursuant to pursuant to 20 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and L.Cr.R. 59.

**IT IS SO ORDERED.**

**DATED** this 9th day of September, 2021.

_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE